NOT DESIGNATED FOR PUBLICATION

No. 127,927

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RAY ANTHONY WATKINS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; SETH L. RUNDLE, judge. Submitted without oral argument. Opinion filed July 10, 2026. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Kristi D. Allen*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general.

Before COBLE, P.J., CLINE and PICKERING, JJ.

PER CURIAM: Ray Anthony Watkins appeals the district court's denial of his motion to suppress a blood draw, claiming the draw was warrantless. Watkins did not object at trial to the blood draw evidence's introduction. Because Watkins did not contemporaneously object, we decline to reach the merits and affirm.

1

In April 2020 at 4:30 a.m., Wichita police officers were dispatched to a collision at Kellogg Avenue and Rock Road in Wichita. Wichita Police Officers Israel Taylor and Aric St. Vrain arrived on the scene and observed that a red Lincoln and a white Lincoln had collided. Both vehicles had extensive damage and single occupants.

Taylor contacted the white Lincoln's driver, who identified himself as Watkins. Taylor tried to open the driver's side door but was unable to. He then opened the front passenger side door, and Watkins maneuvered himself over to the passenger's seat. As Taylor spoke to Watkins, he observed "two open and empty alcoholic beverage containers: One in the driver's seat, and one in the front passenger's seat floorboard." Watkins told Taylor that he believed the light was green.

The fire department had to extricate the other driver from his car and unsuccessfully attempted life saving measures. Emergency Medical Services (EMS) pronounced him dead at the scene.

After EMS provided Watkins with treatment, Taylor placed him in the backseat of St. Vrain's patrol vehicle. While Watkins was seated in the patrol vehicle, Taylor noticed an odor of alcohol emanating from Watkins. Watkins refused to perform field sobriety tests and to submit to a preliminary breath test. Watkins informed Taylor that he had been drinking before the accident. When Taylor asked Watkins how much, "[H]e said that he probably had too much." St. Vrain took Watkins to Wesley Medical Center for a blood draw.

Nurse Angela Cline drew Watkins' blood at 6:38 a.m., 7:23 a.m., and 7:57 a.m. The blood draws occurred before the officers obtained a warrant. No further blood draws occurred after the officers obtained the warrant. Initially, only the first vial was tested,

but later the State had each vial tested. On the second tests, the results were: "[T]he [blood alcohol content (BAC)] at 6:38 a.m. is .218 and .6 nanograms [of THC]; and then at 7:23, .21 and .6 nanograms of THC; and at 7:57, .20 for the blood alcohol content," and ".5 nanograms." Officers obtained a warrant for a blood draw at 8:14 a.m.

The State charged Watkins with involuntary manslaughter while driving under the influence. Watkins moved to suppress the warrantless blood draw. Watkins conceded that the officers had probable cause for the arrest. The motion to suppress' sole issue was whether exigent circumstances justified the warrantless search of Watkins. Watkins contended that no exigent circumstances existed at the 6:38 a.m. blood draw because officers were already in the process of obtaining a warrant and the window of time was not closing.

The State filed a response and argued that the inevitable discovery doctrine, exigent circumstances exception, and good faith excused the warrantless blood draw. In the State's answer, the State focused primarily on admitting the 7:23 a.m. draw. The State's response to Watkins' motion to suppress stated:

> "The first of what would become an unsuccessful series of attempts to reach the assigned 'search warrant duty' judge began at 6:16 [a.m.]. After a revision process, a warrant and application for the same were eventually completed and available for a judge's review at 6:44 [a.m.] . . . . [T]he application for search warrant and warrant that had been available since 6:44 [a.m.] were presented to a district court judge and approved at 8:14 [a.m.]."

At the motion to suppress hearing, Watkins and the State stipulated to the facts within the motion. The State called St. Vrain, who testified to transporting Watkins to Wesley Medical Center for a blood draw while Taylor and their supervisors worked on obtaining a search warrant.

3

St. Vrain explained that the blood draw occurred during COVID, so the hospital was "short staffed" and did not allow visitors. "They were triaging people coming in the vestibule" to prevent unwanted people from coming in. Medical staff provided St. Vrain and Watkins with masks. St. Vrain detailed that Watkins' blood was drawn three times before a warrant was obtained. St. Vrain said that his supervisor told him to collect the blood at 6:38 a.m. because "the judge that they were trying to get a hold of was not answering, and the—I was instructed to go forth with the blood draw, based on exigency." Before the blood draw, St. Vrain observed Watkins having "difficulty speaking or communicating," a moderate odor of alcohol was emanating from Watkins, and Watkins refused field sobriety tests and the breath test.

St. Vrain said that the nurse "advised me that the hospital had a form that they could—that we could sign for her to draw the blood that basically stated we are getting a warrant and she can go ahead with the blood draw." St. Vrain discussed this form with his supervisor and later signed the form. St. Vrain believed exigent circumstances existed "[b]ased on the information that [he] was getting from [his] supervisor, and from what information [he] knew about the hospital and the information from the nurse."

Watkins argued that exigent circumstances did not exist because St. Vrain "got to the hospital around 6:15 in the morning. Within 15 minutes, he signed that form. Eight minutes after that, the blood was already drawn. What's important to note in this, Judge, is, at 6:38 p.m. [*sic*], they had not even submitted the warrant." And St. Vrain "[had] no idea that anything is going on with [the judge] not being able to answer [their] phone; that the calls aren't going through." Watkins countered the State's argument that the 7:23 a.m. blood draw was based on exigent circumstances:

> "[T]he subsequent blood draws aren't because there's exigent circumstances, it's because
> [the officer's] trying to keep a time schedule from the 6:38 [a.m.] draw. So 7:23 [a.m.]—

4

if 6:38 [a.m.] is wrong, 7:23 [a.m.] is wrong, 7:57 [a.m.] is wrong, because they are all fruit of the poisonous tree that all comes from that first illegal draw."

It was not Wesley Medical Center's policy to obtain three draws but the Wichita police department's protocol. The Wichita Police department's policy "is that, in a fatality accident, they do three draws, and then they send the packet off to the lab for testing at that point." The State argued that the 7:23 a.m. draw should be admitted as a blood draw "within three hours for proving a violation of [K.S.A.] 8-1567(a)(2)." If the 7:23 a.m. draw was not admitted, the State argued that the 7:57 a.m. draw should be admitted, allowing the State to prove through a retrograde analysis Watkins' BAC. The State claimed that the second draw proved exigency because, at that time, there was a record of "over an hour of not being able to reach a judge," and the three-hour window was near closing.

The State argued that under an objective standard and based on the record, an officer "really would have no other choice but to draw." The State asked the district court to find exigent circumstances because the officers made efforts to get a warrant, a thorough investigation occurred, and there was a fatality. The State also said:

> "You know, in the days of yore, we'd go to the judge's house and bang on the door until they woke up and, you know, try to get the warrant. Now we do all of this stuff electronically. Especially in the age of [COVID] in April, we weren't going to peoples' houses too much at that time, so we were very fortunate to have these electronic warrants."

The district court treated the issue as question of law. The district court denied the motion to suppress, finding:

> "But the circumstances here are, this was something that started at the tail end of the night at 4:30 in the morning. The State had started trying to get ahold of the on-call

5

judge who was to be available essentially immediately, 24 hours a day, seven days a week. And at 6:30 [a.m.], they had half an hour, from experience, of not being able to get ahold of the on-call judge, who was, just based on the time of day, they would—it would be—that would be the time when you would expect it would be the easiest to simply call somebody up because they're not at the grocery store, they're not somewhere else. They're probably at home still asleep or just getting up. And then there's a half an hour after that of failed attempts to get voicemails returned or to get the call answered. Law enforcement apparently made the decision around 6:30 [a.m.] that they believed that they had exigent circumstances. At that point, there was still an hour left before the three-hour window closed.

. . . .

"With regard to the inevitable discovery exigent circumstances with good-faith exceptions, primarily relying on the exigent circumstances reason for finding that, in spite of the blood having been seized and searched before the warrant was obtained, that that was reasonable under the circumstances in light of the constitution of prohibition on warrantless searches. And I'll—if the State elects to offer one or more of those three blood alcohol test results, I will not deny admission of them based on them having been unconstitutionally seized."

After the district court's ruling, Watkins orally moved to seek an interlocutory appeal on the blood draw issue. The district court did not find a judgment triggering the right to appeal and denied the motion.

At Watkins' jury trial, Nurse Cline testified to drawing Watkins' blood. Watkins cross-examined Cline but did not object to her testimony about the blood draw. St. Vrain also testified to the blood draw. Watkins did not object to the testimony. The State called Marina Divine as an expert forensic scientist in the field of biological testing. Divine discussed receiving three vials, including the 7:23 a.m. vial, and testing them. She stated that Watkins' BAC was ".210 gram percent," and ".6 nanograms" of THC was found in

6

Watkins' blood. The State moved to admit the lab report for the 7:23 a.m. blood vial; Watkins did not object, and the district court admitted the State's exhibit.

The jury convicted Watkins of involuntary manslaughter while driving while having an alcohol concentration in his blood of .08 or more as measured within three hours. Watkins moved for a new trial and asserted that the district court erred when it denied his motion to suppress the blood draw results. The district court denied the motion for new trial.

At sentencing, the district court found Watkins' criminal history score to be B. The district court sentenced Watkins to 162 months' imprisonment.

Watkins appealed.

ANALYSIS

*Watkins Did Not Object at Trial, and the Denial of the Motion to Suppress Issue is Not Preserved*

Watkins challenges the district court's denial of his motion to suppress. He contends that the issue is preserved because the parties fully litigated the issue before trial, the district court denied the motion, the issue was raised again in Watkins' motion for new trial, and the district court again denied the motion. Watkins cites *State v. Fulton*, 292 Kan. 642, Syl. ¶ 2, 256 P.3d 838 (2011), for the proposition that an appellate court may review a trial court's denial of a defendant's motion for a new trial. But *Fulton* is unpersuasive because it did not involve a pretrial motion to suppress without a contemporaneous objection at trial.

7

The State argues that Watkins has not preserved the issue for appeal because he failed to make a contemporaneous objection to the evidence at trial.

K.S.A. 60-404 states:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

"When a pretrial motion to suppress has been denied, the evidence must also be objected to at the time it is offered during the trial in order to preserve the issue for appeal." *State v. Potts*, 304 Kan. 687, Syl. ¶ 3, 374 P.3d 639 (2016). "A pretrial objection to the admission or exclusion of evidence must be preserved by contemporaneously objecting at trial, which can be accomplished through a standing objection." *State v. Crudo*, 318 Kan. 32, 38, 541 P.3d 67 (2024).

Here, Watkins filed and argued a motion to suppress the blood draw evidence, but, at trial, Watkins did not contemporaneously object to the introduction of the blood draw evidence. Watkins moved for a new trial and argued that the district court erred when it denied his motion to suppress. But an objection in a posttrial motion does not satisfy the contemporaneous objection rule because K.S.A. 60-404 "requires the record to reflect that the objection to the evidence was 'timely interposed,'" and the statute applies when the district court considers the motion for new trial, "just as it applies to . . . appellate review." *State v. Cook*, 286 Kan. 1098, 1109, 191 P.3d 294 (2008). Watkins has not preserved this issue for appeal, and we decline to reach the merits.

Affirmed.